E-FILED
Friday, 18 January, 2008  02:34:55 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

```
MICHAEL HAMLIN,                )
                               )
    Plaintiff,                 )
                               )
v.                             )    No. 06-1064
                               )
LUIS TIGERA, JOHN PATE, and    )
STEVEN FERMON,                 )
                               )
    Defendants.                )
```

**O P I N I O N  A N D  O R D E R**

Before the Court is a Motion for Summary Judgment [Doc. 17] and accompanying Memorandum [Doc. 18] filed collectively by Defendants Luis Tigera, John Pate and Steven Fermon. Plaintiff has filed a Response [Doc. 22] and Defendants in turn have filed a Reply [Doc. 23]. For the following reasons, the Motion for Summary Judgment is GRANTED.

**I.
BACKGROUND**

Plaintiff, Michael Hamlin, is an employee of the Illinois Department of Revenue and he has brought this suit alleging that he was denied a promotion to the position of Illinois Gaming Docksite Supervisor because of his sexual orientation.[1]

---

[1] Neither party ever explicitly states in their respective statement of facts that Plaintiff is a homosexual. However, since it is not disputed, for purposes of this brief it will be assumed.

Plaintiff is a law enforcement officer and received his training at the Chicago Police Academy. (Doc. 22 at 11.) In 1990, Plaintiff joined the Illinois Department of Revenue ("IDOR") and then in 1991 Plaintiff joined the Illinois Gaming Board[2] as a special agent. (Hamlin Dep. at 7.) As an agent, his job included licensing casino employees, checking electronic gaming devices and generally enforcing the Illinois Riverboat Gambling Act, 230 ILCS 10/1 et seq. (West 1992), and Illinois Gaming Board Rules.

In 2001, Plaintiff was promoted to shift supervisor at the Par-A-Dice Casino (Doc. 22 at 11) and then in 2002, when the docksite supervisor retired, Plaintiff was assigned the position of interim docksite supervisor. Plaintiff remained in that position from November of 2002 through May of 2004. (Doc. 22 at 11.)

In March of 2004, the IDOR began taking applications for the permanent position of docksite supervisor. There were two separate postings for the open position: one posting for IDOR employees and another for employees of the Illinois State Police ("ISP"). (Doc. 18 at 4; Doc. 22 at 2.) Plaintiff applied for the position through the posting made available for IDOR employees.

---

[2] The Illinois Gaming Board is a division of the IDOR.

According to Defendants, the Illinois Governor's Office had expressed a preference to have the position filled by a state police employee.  (Doc. 18 at 6.)  However, according to Plaintiff, this is not the case and one of the Defendants openly stated at an Illinois gaming board meeting that both IDOR and ISP applicants would be considered on an equal basis.

The parties do not describe in their respective statements of fact each Defendant's role in the hiring process.  According to Plaintiff, the administrator of the Illinois Gaming Board – Jeanette Tamaya – stated that the Illinois Gaming Board would make the decision of whom to hire.  (Doc. 22 at 13.)  However, Plaintiff has not brought suit against Tamaya.  Both Plaintiff and Defendants agree that interviews were conducted and the same questions were asked of all applicants.  (Doc. 18 at 5; Doc. 22 at 2.)  However, neither party states who conducted the interviews.  Plaintiff argues that based upon the application process he was recommended for the position.  (Doc. 22 at 20.)  Typically, the person recommended for the position would ultimately receive the position.  Id.  Plaintiff argues that in this case "the recommendation was made to the administrator, she signed off on it and the promotion was blocked."  There is no explanation for who blocked his promotion or how his promotion was blocked.

Ultimately, Ansel Burditt, a master sergeant with the ISP was chosen for the position. Plaintiff alleges that two of the Defendants Luis Tigera and Steven Fermon "pushed through" Ansel Burditt. Tigera is a Department Administrator for the Illinois Gaming Board and an employee of the ISP and Steven Fermon is an ISP Captain. It is unclear how Plaintiff believes that Tigera and Fermon "pushed through" Burditt's application, but Defendants do not dispute that they had some involvement with the hiring process. (Doc. 23 at 7.) John Pate, the third defendant and a Sergeant with the ISP, does not appear to have been involved in the hiring process since Plaintiff has not put forward any argument or evidence to that effect. In fact, neither party ever describes John Pate's role with the Illinois Gaming Board.[3]

The primary issue discussed below is whether the Defendants were aware of Plaintiff's sexual orientation. To that end, it is necessary to discuss the references to homosexuality that occurred at Plaintiff's workplace since that is the only evidence available to the Court regarding Defendants' state of mind.

---

[3] While this information might be buried in the depositions submitted to the Court, "judges are not like pigs, hunting for truffles buried in the record." Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 754 n.1 (7th Cir. 2006)

4

Plaintiff acknowledges that he never told any of the relevant parties that he was a homosexual and they never asked whether he was a homosexual. (Hamlin Dep. at 50.) However, Plaintiff details four different events involving John Pate that form the basis of his belief that Defendants were aware of his sexual orientation.

First, in September of 2002, Pate cut out an article about a man applying for the Chief of Police position in the Los Angeles Police Department. The man was openly homosexual and, according to the article, was qualified for the position. According to Plaintiff, Pate wrote on top of the article that the "good guys" were not going to get the job – the implication being that the homosexual applicant was only being considered for the position because of his sexual orientation. The article, with the accompanying writing, was not posted in the office. However, Plaintiff saw the article and the writing sitting on a fellow employee's desk and recognized Pate's handwriting. (Hamlin Dep. at 54-55.)

Secondly, shortly before Burditt was selected over Plaintiff for the position, Plaintiff overheard Pate telling others "don't worry, help is on the way." Plaintiff believes that Pate was speaking about Plaintiff and was saying that a permanent docksite supervisor would soon be arriving to replace Plaintiff. However, Plaintiff was never able to verify what

5

Pate was discussing when he made that statement or whether Plaintiff was actually the subject of the comment.  (Hamlin Dep. at 56.)

Next, approximately one year after Plaintiff was turned down for the position of docksite supervisor, Plaintiff had a conversation with Pate.  Plaintiff asked Pate about a house Plaintiff was considering purchasing.  Plaintiff had seen two shoes tied together and thrown across a telephone wire in front of a neighboring house.  Plaintiff asked Pate whether the hanging shoes meant that drugs were sold in the house.  Pate responded by saying "I don't know.  Do you know what a rainbow flag mean when it's on a bar window?"  Plaintiff stated that he did not know that that meant. Pate then said, "Well, that means it's a gay bar."  (Hamlin Dep. at 57.)

The forth and final incident occurred shortly after that when Pate referred to an openly homosexual actor from the television series Star Trek as a "faggot."  However, the comment was not directed at Plaintiff and Pate did not say anything else to evidence that the comment was directed at Plaintiff.  (Hamlin Dep. at 57.)

The other two Defendants, Tigera and Fermon, were not involved in any of the events described by Plaintiff.  However, Plaintiff still believes that both Tigera and Fermon were aware of Plaintiff's sexual orientation because there was a "close

6

relationship" between Pate, Fermon and Tigera.  Specifically, Pate would "discuss his problems" with Fermon and Tiger.  (Doc. 22 at 8.)  Plaintiff believes that that in these discussions Pate told both Fermon and Tigera of Plaintiff's sexual orientation.

## II.
## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case."  Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial."  Warsco v. Preferred Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); See also Celotex Corp., 477 U.S. at 322-24.  "The nonmovant may not rest upon mere

7

allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2nd 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## III.
## ANALYSIS

Plaintiff's case does not survive summary judgment for two reasons: (1) Plaintiff cannot establish that any of the Defendants were aware of his sexual orientation; and (2) in particular, Plaintiff cannot show that any of the Defendants with decision making authority were aware of his sexual orientation.

Plaintiff has brought suit under the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. § 1983 and 42 U.S.C. § 1988 alleging that he was denied the position of docksite supervisor because of his sexual orientation.

In order to establish an equal protection violation, Plaintiff must show that the defendants: "(1) treated him differently from others who were similarly situated, (2) intentionally treated him differently because of his membership in the class to which he belonged (i.e. homosexuals), and (3) because homosexuals do not enjoy any heightened protection under the Constitution, that the discriminatory intent was not rationally related to a legitimate state interest." Schroeder v. Hamilton School District, 282 F.3d 946, 950-51 (7th Cir. 2002) (internal citations omitted).

Plaintiff and Defendants argue over whether the familiar burden shifting analysis laid down in McDonnell Douglas v.

Green, 411 U.S. 792 (1973), is applicable to a claim involving discrimination on the basis of sexual orientation. Plaintiff in particular would like this Court to skip directly to performing a McDonnell Douglas analysis of the facts so that Plaintiff can demonstrate that he was the most qualified person for the job.[4]

However, this Court need not address whether McDonnell Douglas analysis applies because, as a threshold matter, Plaintiff cannot demonstrate that any of the Defendants were aware of Plaintiff's sexual orientation. The whole point of the McDonnell Douglas analysis is to allow a plaintiff to raise an inference of discriminatory intent when no direct evidence is available. Lynch v. Belden and Co., Inc., 882 F.2d 262, 269 (7th Cir. 1989). A party cannot have any intent to discriminate against a member of a class if they lack knowledge of the individual's membership in a class.

Appellate Courts have recognized this in a wide variety of discriminatory contexts including political affiliation, see Hall v. Babb, 389 F.3d 758, 762 (7th Cir. 2004) (stating that the "threshold question is whether the defendants even knew about the [plaintiff's] political activities"), race, see Robinson v. Adam, 847 F.2d 1315 (9th Cir. 1987)(forgoing

---

[4] Even demonstrating that a plaintiff was the most qualified candidate for a position does not create a viable claim of discrimination. See Bell v. Environmental Protection Agency, 232 F.3d 546 (7th Cir. 2000).

McDonnell Douglas analysis in a blind application process because the plaintiff lacked evidence that the employer knew of the applicant's race), pregnancy, see Clay v. Holy Cross Hosp., 253 F.3d 1000, 1005-07 (7th Cir. 2001) (holding that the plaintiff failed to establish a prima facie case of pregnancy discrimination even though she told co-workers she was pregnant because she could not provide any evidence that the actual person who terminated her employment knew she was pregnant), and religious persuasion, see Lubestky v. Applied Card Systems, Inc., 296 F.3d 1301, 1305 (11th Cir. 2002)(job applicant failed to establish *prima facie* case of religious discrimination because the decision-maker who ordered recession of the employment offer was not aware that the applicant was an Orthodox Jew).

Neither party brings forward any case in which a closeted homosexual has brought a claim of employment discrimination. Nevertheless, the reasoning laid down in the previously noted cases applies in this context.  As a result, this Court holds that for a homosexual to bring a claim of discrimination, as a threshold matter they must at least have some evidence that the relevant decision makers were aware of the employee's sexual orientation at the time the employment decision was made.

In the case at bar, this Court is baffled as to how, according to Plaintiff, any of the Defendants supposedly learned

of his sexual orientation.  Plaintiff never told any of the relevant parties that he was a homosexual.  Plaintiff never described any incidents from which any of Defendants could have learned of his sexual orientation.  Some people in our society believe that others, particularly other homosexuals, have an innate ability to tell a person's sexual orientation by their mannerism, dress and vocal inflections: an ability referred to in contemporary vernacular as "gaydar."   Todd Brower, <u>Multistable Figures: Sexual Orientation Visibility and Its Effects on Experiences of Sexual Minorities in the Courts</u>, 27 Pace L. Rev. 141, n. 7 (2007).  However, Plaintiff never argues that any of the Defendants have such an ability or that he spoke, acted or dressed in a way that would lead anyone to believe that he was a homosexual.  Plaintiff never states that he was involved with any gay public organizations away from work such as GLAAD.  When Plaintiff was accused of dating female employees at the Par-A-Dice Casino, Plaintiff did not put forward the rather obvious defense.  [Hamlin Dep. at 52.]  As far as this Court can tell, Plaintiff never told anyone that he was a homosexual.

 Nevertheless, while Plaintiff cannot show how anyone learned of his sexuality, Plaintiff attempts to demonstrate that Defendants were aware of his sexual orientation because of four incidents involving John Pate.

The first incident occurred approximately two years before Plaintiff was turned down for the position. At that time Plaintiff saw an article on which Pate wrote that a Los Angeles Chief of Police applicant would get the job over the "good guys" because of his sexual orientation. At worst, Pate's writing was intended to express Pate's opinion that a homosexual should not be in the position of Los Angeles Police Chief. However, the article and writings were not sent to Plaintiff. In fact, they were not even publicly posted in the office. Instead, Plaintiff saw the article and writings on a coworker's desk. Plaintiff was never mentioned in Pate's writing and nothing in the writings was directed at Plaintiff. While Pate might have expressed an opinion which Plaintiff found offensive, this does not mean that Pate was aware of Plaintiff's sexual orientation.

In the second instance, Plaintiff overheard Pate saying "don't worry, help is on the way" shortly before it was announced that Plaintiff would not receive the open position. In this instance, Pate could have been discussing anything and without any context there is no basis to reach a conclusion.

Next, Plaintiff points to the time that Pate asked Plaintiff whether he knew what it meant when a bar had a rainbow flag in the window. The implication that Plaintiff would like this Court to draw is that Pate was asking the question sarcastically.

Plaintiff believes that at that time Pate had already known for over a year that Plaintiff was a homosexual.  So, Plaintiff would like this Court to assume that Pate meant the opposite of what he said; Instead of asking Plaintiff if he knew what a rainbow flag meant, Pate was actually derisively telling Plaintiff 'you know what a rainbow flag means.'  However, Pate could just as easily have been asking Plaintiff because Pate wanted to read Plaintiff's response and determine whether Plaintiff was actually a homosexual.  Plaintiff never argues that Pate adopted a sarcastic tone or acted in any way to evidence that Pate had known for over a year that Plaintiff was a homosexual.  This Court cannot assume that Pate was speaking sarcastically and meant the opposite of what he said when there is nothing in the record which would lead this Court to believe that Pate was speaking in an acerbic tone.  Shepherd v. Slater Steels Corp., 168 F.3d 998, 1006 n.4 (7th Cir. 1999) (noting that a Court cannot assume facts that are not in evidence).  And, even if Pate had spoken sarcastically, that does not evidence that he had known of Plaintiff's sexual orientation for over a year.

In the final incident, long after Plaintiff was turned down for the position, Pate referred to an openly homosexual actor from the television series Star Trek as a "faggot."  Once again, Pate's comments were not directed at Plaintiff and they in no

14

way demonstrate that Pate had been aware that Plaintiff was homosexual for over a year.  While Pate's comment may have been offensive and brutish, employment discrimination suits cannot be brought to enforce a "general civility code" for the workplace. Oncale v. Sundowner Offshore Servs. Inc, 523 U.S. 75, 81 (1998).

Finally, even if Plaintiff could show that Pate was aware of his sexual orientation and harbored animus toward homosexuals, Plaintiff cannot show that any of the Defendants with decision making authority were aware of his sexual orientation or exhibited signs of homophobia.  Plaintiff concedes that Pate did not have direct authority to determine who to hire for the position of docksite supervisor. [Doc. 18 at 6-7; Doc. 22 at 8].  Plaintiff believes that Tigera and Fermon were both involved in the employment decision and Plaintiff believes Pate influenced them through a secret conversation because they would "discuss problems."  However, Plaintiff has not put forward any evidence beyond the fact that Tigera and Fermon were acquaintances with Pate.  There is no basis to conclude that such a conversation took place, or that they were aware of Plaintiff's sexual orientation, or that they were aware Pate's alleged homophobia, or that they were in any degree influenced by Pate.  To assume that any such conversation occurred is to assume facts that are not in evidence.  See Clay, 253 F.3d 1000, 1005-1007 (declining to assume that a decision

maker was aware of a woman's pregnancy simply because he was at a conference with fellow employees who were told of the pregnancy).

Accordingly, because Plaintiff has failed to show that any of the Defendants possessing decision making authority were aware of his sexual orientation at the time the employment decision was made, or had been influenced in their decision by the alleged homophobia of Pate, Plaintiff has failed to establish a *prima facie* case of discrimination.

## IV.
## CONCLUSION

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

ENTERED this   18th   day of January, 2008.

s/Joe Billy McDade
Joe Billy McDade
United States District Judge
